UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

| | |
|---|---|
| CHARLEE ARCHAMBAULT, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF JACOB ARCHAMBAULT; <br><br> Plaintiff, <br><br> vs. <br><br> THE UNITED STATES OF AMERICA, JOSHUA ANTMAN; JAY ROMERO, INDIVIDUALLY AND IN THEIR OFFICIAL CAPACITY AS POLICE OFFICERS FOR THE ROSEBUD SIOUX TRIBAL LAW ENFORCEMENT SERVICES; AND UNKNOWN SUPERVISORY PERSONNEL OF THE UNITED STATES, INDIVIDUALLY; <br><br> Defendants.[1] | 3:22-CV-03002-RAL <br><br><br><br> OPINION AND ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS EXCEPT AS TO BIVENS CLAIM AGAINST INDIVIDUAL OFFICERS AND STAYING CLAIM PENDING TRIBAL COURT EXHAUSTION |

In January of 2019, on the Rosebud Indian Reservation, Jacob Archambault Spotted Tail was shot and killed during an encounter with two Rosebud Sioux Tribe police officers. Jacob's mother, Charlee Archambault, alleges that the officers violated her son's constitutional rights, and that she and Jacob's estate are entitled to damages. All Defendants named in this case have moved to dismiss the lawsuit on various grounds. Doc. 20; Doc. 22; Doc. 25. For the reasons set forth below, this Court grants the motions to dismiss all § 1983 claims as well as any claims against the

---

[1] At the motion hearing, the parties stipulated to modifying how the Defendants are named to correct the names of the individual Officers.

United States and "Unknown Supervisory Personnel" of the United States. This Court stays the remaining <u>Bivens</u>-based claim against the named tribal police officers pending exhaustion of any available tribal court remedy.

## I. Standard on Motion to Dismiss

To survive a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Courts must accept the plaintiff's factual allegations as true and make all inferences in the plaintiff's favor, but need not accept the plaintiff's legal conclusions. <u>Retro Television Network, Inc. v. Luken Commc'ns, LLC</u>, 696 F.3d 766, 768–69 (8th Cir. 2012). Although detailed factual allegations are unnecessary, the plaintiff must plead enough facts to "state a claim to relief that is plausible on its face[,]" meaning "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)). Therefore, the "factual allegations must be sufficient to raise a right to relief above the speculative level." <u>Cook v. George's, Inc.</u>, 952 F.3d 935, 938 (8th Cir. 2020) (cleaned up and citation omitted).

On a motion to dismiss under Rule 12(b)(1), however, the standard depends on whether the defendant is making a facial attack or factual attack on subject matter jurisdiction. <u>Stalley v. Cath. Health Initiatives</u>, 509 F.3d 517, 520–21 (8th Cir. 2007). When a defendant makes a facial attack to challenge whether the facts alleged in the complaint establish subject matter jurisdiction under Rule 12(b)(1), the plaintiff is afforded similar safeguards as in a Rule 12(b)(6) motion. <u>Osborn v. United States</u>, 918 F.2d 724, 729 n.6 (8th Cir. 1990). Namely, the Court must "accept as true all factual allegations in the complaint, giving no effect to conclusory allegations of law,"

and determine whether the plaintiff's alleged facts "affirmatively and plausibly suggest" that jurisdiction exists. Stalley, 509 F.3d at 521. A court's review then is limited to the face of the pleadings. Branson Label, Inc. v. City of Branson, 793 F.3d 910, 914 (8th Cir. 2015).

Conversely, when a defendant attacks the factual basis for subject matter jurisdiction, a court can consider matters outside the pleadings, "and the non-moving party does not have the benefit of 12(b)(6) safeguards." Osborn, 918 F.2d at 729 n.6. "A factual attack occurs when the defendant challenges the veracity of the facts underpinning subject matter jurisdiction." Davis v. Anthony, Inc., 886 F.3d 674, 679 (8th Cir. 2018) (cleaned up and citation omitted). In that case, "no presumptive truthfulness attaches to the plaintiff's allegations," and a "court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." Osborn, 918 F.2d at 730 (citation omitted). Here, all Defendants appear to raise facial attacks, so this Court takes the well-pleaded allegations of the Complaint as true in ruling on the motions to dismiss.

## II. Background

### A. Facts alleged in Complaint

The Rosebud Sioux Tribe, a federally recognized Indian tribe, runs the Rosebud Sioux Tribe Law Enforcement Services ("RSTLES") to provide policing on the Rosebud Indian Reservation in Todd County, South Dakota. Doc. 1 at ¶¶ 4–6. The United States, through the Department of the Interior, Bureau of Indian Affairs, has contracted with the Tribe under the Indian Self-Determination and Education Assistance Act of 1975 ("ISDEAA") to provide law enforcement services on the Reservation.[2]

---

[2] These agreements are commonly referred to as "638 contracts":

ISDEAA, Public Law 93–638, authorizes federal agencies to contract with Indian tribes to provide services on the reservation. Such a contract is commonly referred to as a "self-determination contract" or "638 contract." A self-determination contract is a contract between a tribal organization and the Federal Government for

3

At around 5:00 p.m. on January 27, 2019, Defendant Officer Joshua Antman, an employee of RSTLES, was dispatched to a disturbance where Jacob Archambault Spotted Tail was identified as a person of interest and driving a gold SUV. Doc. 1 at ¶ 10. Although not expressly stated in the Complaint, the briefing makes clear and the parties at the motion hearing agreed to judicial notice that Archambault is a tribal member and the events in question occurred within the exterior boundaries of the Rosebud Indian Reservation. Doc 21 at ¶ 2; Doc. 26 at 1, 7, 10, 12; Doc. 37 at 3, 6. Sometime shortly thereafter, Officer Antman observed a gold Chevrolet Tahoe parked near the intersection of Hospital Road and Tiny Road. Doc. 1 at ¶ 11. Officer Antman pulled his patrol car behind the Tahoe and saw a female passenger exit the rear driver's side of the vehicle. Id. at ¶ 13. Officer Antman did not try to speak to her. Id. at ¶ 14.

Officer Antman activated his emergency lights to execute a traffic stop as the Tahoe pulled away. Id. at ¶ 14. The Tahoe did not stop for the emergency lights, but instead crossed Hospital Road and traveled down Tiny Road toward BIA Highway 1. Id. at ¶ 16; Doc. 21 at ¶ 6. At some point, the Tahoe turned around and traveled the other direction up Tiny Road, and Officer Antman saw that Archambault was the driver. Doc. 1 at ¶ 17.

---

the planning, conduct and administration of programs or services which are otherwise provided to Indian tribes and their members pursuant to Federal law. Congress enacted the ISDEAA to encourage Indian self-determination and tribal control over administration of federal programs for the benefit of Indians, by authorizing self-determination contracts between the United States, through the Secretaries of the Interior and of Health and Human Services, and Indian tribes. There are several categories of contractible services or programs called out by the statute, one of which concerns the provision of a police force and related law enforcement functions on Indian lands. Congress thus recognized that one of the ways to further Indian self-determination was to allow a tribe to contract for law enforcement services so the tribe could maintain a tribal police force on the reservation capable of effectively enforcing criminal laws.

Boney v. Valline, 597 F. Supp. 2d 1167, 1173 (D. Nev. 2009) (cleaned up and citations omitted).

Archambault drove the Tahoe up Tiny Road for a short distance, before merging with Low Rent Housing Road and immediately turning onto North Spotted Tail Lane. Id. at ¶ 18. North Spotted Tail Lane leads to a dead end, but there is an off-road trail near the end of the road that connects to Spotted Tail Lane. Doc. 32 at 3. The trail runs roughly parallel to the two roads until it makes a sharp turn for a steep climb onto Spotted Tail Lane. Id. Archambault turned onto this trail, but the Tahoe lost traction due to an accumulation of snow on the ground. Doc 1 at ¶¶ 19, 21.

Officer Antman parked his patrol car behind the Tahoe to block access to North Spotted Tail Lane as Archambault struggled to maneuver the vehicle up the trail. Id. at ¶ 22. At this point, Defendant Officer Jay A. Romero, also with RSTLES, arrived on the scene and parked next to Officer Antman's patrol car, further blocking access to North Spotted Tail Lane. Id. at ¶ 23. Officer Antman and Officer Romero positioned their patrol cars perpendicular to the Tahoe. Id. at ¶ 25. The two officers exited their vehicles and stood to the side of their patrol cars while Archambault tried to crest the snowy incline in the Tahoe. Id. at ¶ 26. Unable to climb the trail, Archambault reversed the Tahoe past Officer Antman, stopped next to Officer Romero's patrol car, and drove forward in another attempt to crest the final portion of the trail. Id. at ¶¶ 27–28. The Tahoe spun out yet again. Id. at ¶ 29.

Archambault reversed the Tahoe to make a third run at the incline. Id. at ¶ 30. This time, as he passed the patrol cars, the Tahoe hit the bumper of Officer Romero's car. Id. at ¶ 31. Officer Antman and then Officer Romero began firing their duty weapons. Id. at ¶¶ 32–33. They fired a combined fifteen rounds at Archambault and the Tahoe—some through the passenger door of the Tahoe and some through the windshield. Id. ¶¶ 34–36. Archambault was struck and suffered multiple gunshot wounds, including one in the left side of his chest, after which he drove down a

5

steep embankment and crashed into a ravine. Id. at ¶¶ 37-39. Archambault was partially ejected from the Tahoe. Id. at 40. Plaintiff alleges that even though Archambault was alive when the Officers went to check on him, neither officer rendered any medical aid. Id. at ¶¶ 40-41. Archambault died at the scene. Id. at ¶ 41. An autopsy later concluded that Archambault's death was a homicide, caused primarily by the gunshot to the left side of his chest, which pierced his left lung. Id. at ¶¶ 43-44.

## B. Procedural History

On January 24, 2022, Plaintiff Charlee Archambault, individually and as personal representative of the Estate of Jacob Archambault, filed a four-count complaint against Defendants. Doc. 1. Plaintiff named four separate defendants: the United States of America; Joshua Antman and Jay A. Romero,[3] individually and in their official capacities as police officers for RSTLES; and Unknown Supervisory Personnel of the United States, individually. Id.

Plaintiff's Complaint and briefing are not entirely clear or consistent about what claims are alleged against which Defendants. For example, Count One of the Complaint, Doc. 1 at 6, is titled "Violation of Constitutionally Protected Rights - 42 U.S.C.A. § 1983 (Bivens Action) (Estate of Jacob Archambault v. Joshua Atman [sic] and Jay Romero Sr. [sic])." Of course, a § 1983 claim for deprivation of constitutional rights under color of state law is legally distinct from a Bivens claim requiring federal and not state action. See discussion *infra* Part III.A.2; cf. Steiner v. Twentieth Century-Fox Film Corp., 140 F. Supp. 906, 908 (S.D. Cal. 1953) ("Inconsistent

---

[3] The complaint erroneously identified Officer Antman as "Joshua *Atman*" and Officer Romero as "Jay Romero *Sr.*" Doc. 1 (emphasis added). Plaintiff acknowledged she was unsure of the proper spelling of these Defendants' names and pledged to amend the complaint to reflect the correct spelling later on. Id. The complaint has not been amended yet, but subsequent filings have clarified that these Defendants are Joshua *Antman* and Jay A. Romero (not senior) and the parties have agreed that this Court can reform how the defendants are named to correct this information. See Doc. 21; Doc. 26.

allegations can be made in separate claims or defenses . . . [but not] in the same cause of action[.]"). Plaintiff in briefing characterizes Count One as a "<u>Bivens</u> claim against *Defendants in their individual capacities*[,]" Doc. 32 at 1 (emphasis added), while the Complaint alleges this claim solely against Defendants Antman and Romero but in both their individual *and* official capacities, and not against all four Defendants in their individual capacities. Because pleadings "must be construed favorably to the pleader and judged by substance rather than form[,]" this Court has endeavored to untangle Plaintiff's claims as best it can to do substantial justice. <u>Mut. Creamery Ins. Co. v. Iowa Nat. Mut. Ins. Co.</u>, 427 F.2d 504, 508 (8th Cir. 1970). This Court understands Count One to be brought under <u>Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics</u>, 403 U.S. 388 (1971), against Antman and Romero in their individual capacities. Doc. 1 at ¶¶ 40–55; Doc. 32 at 1. After all, within Count One, Plaintiff directly states that the "claim of relief is brought pursuant to <u>Bivens</u> . . ." and that Defendants Antman and Romero were "acting under color of federal law." Doc. 1 at ¶¶ 40, 46. Counts Two (entitled "Wrongful Death – 42 U.S.C. § 1983"), Three (entitled "Violation of Civil Rights to Familial Relationship – 42 U.S.C. § 1983"), and Four (entitled "Violation of Civil Rights 42 U.S.C. § 1983") are brought solely under 42 U.S.C. § 1983, likewise against Antman and Romero. Doc. 1 at ¶¶ 54–66. Counts One, Two, and Four are brought by Charlee Archambault as Personal Representative of the Estate of Jacob Archambault. Doc. 1 at ¶¶ 40–56, 61–66. Count Three is brought personally by Charlee Archambault for loss of consortium damages—that is, loss of the care, companionship, and support of her son. Doc. 1 at ¶¶ 57–60.

Each of the causes of action have similar contentions about what the wrongful conduct was. Count One alleges that Antman and Romero, "while under the color of law, used excessive force and deprived Jacob Archambault of his constitutional rights." Doc. 32 at 1. Count Two

alleges "a violation of Jacob Archambault's constitutional right[s] through [Antman and Romero's] use of excessive, unreasonable, and unwarranted force." Id. at 2. Count Three alleges a violation of Jacob's "constitutional rights through [Antman and Romero] seizing Jacob Archambault and killing him through the use of unreasonable, unjustified, and deadly force[,]" Doc. 32 at 2, which was a "direct and proximate cause of [Charlee's] loss of a familial relationship with her son[,]" Doc. 1 at ¶ 56. Finally, Count Four alleges that Antman and Romero "violated Jacob Archambault's rights under the Constitution" and "the rights violations caused injury and damages prior to death." Doc. 32 at 2.

The Complaint does not reference or plead any claim under the Federal Tort Claims Act. Although the Complaint names as defendants the United States and its "Unknown Supervisory Personnel" in the caption, the Complaint is devoid of any allegation of wrongdoing against the United States and its Unknown Supervisors and indeed does not mention those defendants in any of the causes of action. Doc. 1.

## III. Discussion

### A. Antman and Romero Motions to Dismiss

Officer Antman and Officer Romero ("the Officers") have moved to dismiss Plaintiff's claims against them under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Doc. 20; Doc. 25. The Officers make essentially the same arguments, so this Court combines its discussion on the two motions. The motions frame the questions whether Plaintiff has plead any claims that this Court has the power to hear, and if so, whether this Court should presently exercise that power. Resolution of these questions in turn depend on three issues: (1) Whether Plaintiff's suit against the Officers is in fact against the Rosebud Sioux Tribe as a sovereign entity and consequently barred by tribal sovereign immunity; (2) Whether Bivens or 42 U.S.C § 1983 extends a cause of

action against the Officers on the alleged facts; and (3) Whether this Court should require Plaintiff to exhaust any remedies in Rosebud Sioux Tribal Court before exercising jurisdiction. This Court will address these issues in turn.

### 1. Whether Plaintiff's suit against the Officers is in fact against the Rosebud Sioux Tribe as a sovereign entity and consequently barred by tribal sovereign immunity.

Plaintiff did not name the Rosebud Sioux Tribe as a defendant but sued two of its law enforcement officers, naming them individually and "in their official capacity as police officers for the Rosebud Sioux Tribe Law Enforcement Services." Doc. 1. "A suit against a governmental officer in his official capacity is the same as a suit against the entity of which the officer is an agent." Stanko v. Oglala Sioux Tribe, 916 F.3d 694, 697 (8th Cir. 2019) (quoting McMillian v. Monroe Cnty., 520 U.S. 781, 785 n.2 (1997)). "Indian tribes are distinct independent political communities, retaining their original natural rights in matters of local self-government." Santa Clara Pueblo v. Martinez, 436 U.S. 49, 55 (1978) (citation omitted and cleaned up). In line with that principle, "Indian tribes . . . possess[] the common-law immunity from suit traditionally enjoyed by sovereign powers." Id. at 58; Alltel Commc'ns, LLC v. DeJordy, 675 F.3d 1100, 1102 (8th Cir. 2012). "Thus, as a matter of federal law, the Tribe is subject to suit only if Congress has authorized the suit or the tribe has waived its immunity." Stanko, 916 F.3d at 697. No such waiver of immunity by Congress or the Tribe pertains to claims made in the complaint, so the claims against the officers in their official capacities are barred by tribal sovereign immunity. Plaintiff recognizes as much in briefing in recasting the claims as against the officers only in their individual capacity. Doc. 32 at 5.

When a lawsuit is brought against tribal employees in their individual capacities, courts are instructed to "look to whether the sovereign is the real party in interest to determine whether sovereign immunity bars the suit." Lewis v. Clarke, 137 S. Ct. 1285, 1290 (2017); see also Ten

Eyck v. United States, 463 F. Supp. 3d 969, 977 (D.S.D. 2020) ("However, a plaintiff cannot circumvent tribal immunity by the simple expedient of naming an officer of the Tribe as a defendant, rather than the sovereign entity.") (citations omitted and cleaned up); Whiting v. Martinez, No. 3:15-CV-03017-RAL, 2016 WL 297434, at *3 (D.S.D. Jan. 22, 2016) ("The Eighth Circuit has found that a tribe's sovereign immunity may extend to a tribal entity or agency."). Determining the real party in interest is "paramount" because it "dictates what immunities may be available" to the defendants. Lewis, 137 S. Ct. at 1291.

The Supreme Court has given some indication that the general rules of sovereign immunity apply in the tribal context in some circumstances. Id. And if that is the case, to determine whether the suit against the individual officers is in fact against the Rosebud Sioux Tribe, this Court would have to look to "the *effect* of the relief sought." Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 107 (1984); see also Lewis 137 S. Ct. at 1291 (allowing suit to go forward against tribal commercial employee in individual capacity when suit did "not require action by the sovereign or disturb the sovereign's property."). Sovereign immunity typically does not bar a Bivens or § 1983 action against federal or state officials in their individual capacities. Indeed, a major purpose of those causes of action is to deter wrongful individual conduct. See Corr. Servs. Corp. v. Malesko, 534 U.S. 61, 70 (2001) (citing F.D.I.C. v. Meyer, 510 U.S. 471, 474 (1994)) ("The purpose of Bivens is to deter individual federal officers from committing constitutional violations. . . . [T]he threat of suit against an individual's employer was not the kind of deterrence contemplated by Bivens."). Therefore, "[a]n officer sued in his individual capacity . . . although entitled to certain personal immunity defenses . . . cannot claim *sovereign* immunity from suit, so long as the relief is sought . . . from the officer personally." Pistor v. Garcia, 791 F.3d 1104, 1112 (9th Cir. 2015)

10

(quoting Kentucky v. Graham, 473 U.S. 159, 166–67 (1985) and Alden v. Maine, 527 U.S. 706, 757 (1999)) (quotation cleaned up).

But "the general principles of sovereign immunity" may not "always apply to define the boundaries of *tribal* sovereign immunity." Ten Eyck, 463 F. Supp. 3d. at 980 (emphasis added); see also Upper Skagit Indian Tribe v. Lundgren, 138 S. Ct. 1649, 1654 (2018) (declining to determine the limits on tribal sovereign immunity in the first instance where the federal government and tribe argued that "immunity doctrines lifted from other contexts do not always neatly apply to Indian tribes"); Kiowa Tribe of Oklahoma v. Mfg. Techs., Inc., 523 U.S. 751, 755–56 (1998) ("We have often noted, however, that the immunity possessed by Indian tribes is not coextensive with that of the States."). For example, citing a lack of Supreme Court and Eighth Circuit precedent, the court in Ten Eyck questioned whether tribal officials, like their federal and state counterparts, are always "precluded from invoking the defense of tribal sovereign immunity to a claim for money damages alleged against the officer in his individual capacity," that is, at least "if such claim arises from the officer exercising the tribe's inherent sovereign powers." 463 F. Supp. 3d at 980 (emphasis removed). This Court, too, has previously signaled that to sue tribal officials in their individual capacity, a plaintiff must at least allege some facts to suggest "Defendants did not act on the Tribe's behalf or that Defendants exceeded the authority granted to them by the Tribe."[4] Whiting, 2016 WL 297434, at *3 (citation omitted).

However, the Eighth Circuit addressed this issue in Stanko v. Oglala Sioux Tribe, where a non-Indian sued tribal officers after detaining him after a traffic stop allegedly in violation of his constitutional and civil rights. 926 F.3d at 696. After affirming dismissal of claims against the

---

[4] The use of constitutionally excessive deadly force, as alleged by Plaintiff here, may be one such instance of a tribal officer exceeding the authority granted by the tribe to the officer.

tribe itself and the officers in their official capacities, the Eighth Circuit without analysis simply stated that the plaintiff's "claims against tribal officers acting in their individual capacities [were] not barred by the Tribe's sovereign immunity." Id. at 697.  Although the plaintiff in Stanko was a non-Indian suing tribal officials for alleged constitutional violations that occurred on tribal land, there seems to be no reason why sovereign immunity should hinge on the race or tribal status of the plaintiff.  However, because this Court is deferring proceeding on one claim pending tribal court exhaustion, this Court will leave it for the Rosebud Sioux Tribal Court to consider not only whether there is a cause of action in tribal court against the individual officers akin to Bivens for the alleged excessive use of deadly force, but also whether tribal sovereign immunity has any impact on such a claim.

This Court understands "[s]overeign immunity is a jurisdictional question," and that if it exists, the suit against the officers must be dismissed regardless of the merits.  Rupp v. Omaha Indian Tribe, 45 F.3d 1241, 1244 (8th Cir. 1995) (citing Puyallup Tribe, Inc. v. Washington Game Dep't, 433 U.S. 165, 172 (1977)); see also Brownback v. King, 141 S. Ct. 740, 749 (2021) ("Ordinarily, a court cannot issue a ruling on the merits when it has no jurisdiction . . . .") (cleaned up and citation omitted).  In Brownback, the Supreme Court noted that in certain cases, where the merits and jurisdictional elements of the alleged claims overlap, how a court characterizes its ruling can be largely a matter of semantics:

> In cases such as this one where a plaintiff fails to plausibly allege an element that is both a merit element of a claim and a jurisdictional element, the district court may dismiss the claim under Rule 12(b)(1) or Rule 12(b)(6). Or both. The label does not change the lack of subject-matter jurisdiction, and the claim fails on the merits because it does not state a claim upon which relief can be granted.

141 S. Ct. at 749 n.8.  Given the overlapping claims alleged here and guided in part by the Eighth Circuit's approach in Stanko, this Court considers it appropriate to address whether Plaintiff has

plausibly alleged a claim upon which relief can be granted against the Officers under <u>Bivens</u> or §
1983 without fully deciding the tribal sovereign immunity question.  <u>See Stanko</u>, 916 F.2d at 698
(focusing on whether plaintiff stated a plausible claim).

2.  **Whether <u>Bivens</u> or 42 U.S.C § 1983 extends a cause of action against the Officers on the alleged facts.**

Plaintiff rests her claims on 42 U.S.C. § 1983 and <u>Bivens</u>.  Individuals who believe their
constitutional rights have been violated by the police have two primary avenues for civil relief
available under federal law: (1) 42 U.S.C. § 1983, which applies to state and local officers; and (2)
the § 1983 analog for suits against federal actors that the Supreme Court recognized in <u>Bivens</u>,
403 U.S. 388.  <u>Williams v. City of Carl Junction, Missouri</u>, 480 F.3d 871, 875 n.2 (8th Cir. 2007)
(quoting <u>Hartman v. Moore</u>, 547 U.S. 250, 254 n.2 (2006)); <u>see also</u> Seth P. Waxman & Trevor
W. Morrison, <u>What Kind of Immunity? Federal Officers, State Criminal Law, and the Supremacy
Clause</u>, 112 Yale L.J. 2195, 2208 (2003) (discussing available legal tools for constraining the
conduct of individual law enforcement officers).  Section 1983 provides that "[e]very person who,
under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or
causes to be subjected, any citizen of the United States . . . to the deprivation of any rights,
privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured
. . . ." 42 U.S.C § 1983. Similarly, "<u>Bivens</u> established that the victims of a constitutional violation
by a federal agent have a right to recover damages against the official in federal court despite the
absence of any statute conferring such a right." <u>Carlson v. Green</u>, 446 U.S. 14, 18 (1980) (citation
omitted).

In general, "[t]he essential elements of a § 1983 claim[5] are (1) that the defendant(s) acted under color of state law, and (2) that the alleged wrongful conduct deprived the plaintiff of a constitutionally protected federal right." Schmidt v. City of Bella Villa, 557 F.3d 564, 571 (8th Cir. 2009). An essential element of a § 1983 claim is that the defendants acted under color of state law. Id. "The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." Parker v. Boyer, 93 F.3d 445, 447–48 (8th Cir. 1996) (quoting West v. Atkins, 487 U.S. 42, 49 (1988)) (cleaned up and citation omitted). Moreover, "[t]he injury complained of must have been caused by the exercise of some right or privilege created by the state, by a rule of conduct imposed by the state, or by a person for whom the state is responsible." Id. at 448.

While arguing that 42 U.S.C § 1983 supplies a cause of action against the Officers, Plaintiff has alleged no facts to suggest that the Officers acted under color of state law. The allegations in the Complaint about the Officers acting under color of state law are all conclusory and contradicted by other allegations in the Complaint that the Officers were acting under color of or as agents of

---

[5] The Eighth Circuit has summarized the scope of a § 1983 claim as follows:

> Section 1983 does not confer substantive rights but merely provides a means to vindicate rights conferred by the Constitution or laws of the United States. In addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force. The two primary sources of constitutional protection against physically abusive governmental conduct are the Fourth and Eighth Amendments. The Fourth Amendment's prohibition against unreasonable seizures of the person applies to excessive-force claims that arise in the context of an arrest or investigatory stop of a free citizen," while the Eighth Amendment's ban on cruel and unusual punishment applies to excessive-force claims brought by convicted criminals serving their sentences.

Wilson v. Spain, 209 F.3d 713, 715 (8th Cir. 2000) (cleaned up and citations omitted).

federal law.  Doc. 1.  Indeed, Plaintiff in her briefing argued that the Officers were "performing a *federal* function under the color of law derived from *federal* law," and conceded at the hearing the absence of any evidence of the Officers performing a state function.  Doc. 32 at 6 (emphasis added).  Plaintiff notes that under the Tribe's 638 contract tribal police may sometimes have the power to assist state law enforcement, but even then, Plaintiff only makes this assertion to support that the Officers were "federal actors."  Id. at 8–9.

"The Supreme Court has long distinguished Indian tribes from territories and states." Nygaard v. Taylor, No. 3:19-CV-03016-RAL, 2022 WL 1487455, at *14 (D.S.D. May 11, 2022). See Michigan v. Bay Mills Indian Cmty., 572 U.S. 782, 788 (2014); Cherokee Nation v. Georgia, 30 U.S 1, 17 (1831)).  Tribes and in turn their tribal officers thus are as a general rule not state actors.  There is no action under color of state law when Tribal law enforcement officers employed by a tribe under a 638 contract respond to a dispatch call on the reservation about a tribal member having caused a disturbance and then pursue the tribal member on the reservation leading to a confrontation and use of deadly force.  Simply put, Plaintiff has not plead and appears to be unable to plead a viable claim under 42 U.S.C. § 1983 under these facts.  As such, Counts Two, Three and Four must be dismissed.  See Stanko, 916 F.3d at 696 ("The district court properly rejected [Plaintiff's] contention that Congress expressly authorized § 1983 suits against Indian tribes.").

Plaintiff's Bivens claim in Count One alleges that the Officers, while employed by RSTLES, were acting as federal officials under the color of federal law, rather than tribal officials acting under the color of tribal law, when they allegedly violated Jacob Archambault's constitutional rights.  Doc. 1 at ¶¶ 40–55.  According to Plaintiff, the Officers are federal actors subject to Bivens by virtue of the Tribe's 638 contract with the federal government and because they were performing congruent tribal and federal functions during the alleged events. Doc. 1 at

15

¶¶ 3–48; Doc. 32 at 7–9. Plaintiff argues in briefing that at the time of the alleged constitutional violations, the Officers were "investigating crimes that could have both Tribal and Federal jurisdiction." Doc. 32 at 8–9. In other words, the Officers were performing "duties that would assist federal law enforcement," which should be considered a federal function thus subjecting them to <u>Bivens</u> liability.[6] <u>Id.</u> at 9.

"[T]o state an actionable <u>Bivens</u> claim, a plaintiff must show[7] (1) a violation of a constitutional right, (2) committed by a Federal actor, (3) who acted with the requisite culpability and causation to violate the constitutional right." <u>Mendez v. FMC-Rochester</u>, No. 07-CV-2609(JMR/RLE), 2007 WL 2320547, at *3 (D. Minn. Aug. 10, 2007) (quoting <u>Hart v. City of Little Rock</u>, 432 F.3d 801, 804 (8th Cir. 2006)) (cleaned up and citations omitted). As a judicially created cause of action, <u>Bivens</u> is more limited than its § 1983 counterpart. The Supreme Court has been hesitant to extend <u>Bivens</u> actions to cover a wide array of alleged constitutional violations. <u>See</u> <u>Egbert v. Boule</u>, 142 S. Ct. 1793, 1799 (2022) ("Over the past 42 years, however, we have declined 11 times to imply a similar cause of action [under <u>Bivens</u>] for other alleged constitutional violations."); <u>Ziglar v. Abbasi</u>, 137 S. Ct. 1843, 1857 (2017) (quoting <u>Iqbal</u>, 556 U.S. at 675) ("[T]he Court has made clear that expanding the <u>Bivens</u> remedy is now a 'disfavored' judicial activity."). There are at least three recognized, albeit limited, substantive causes of action available under <u>Bivens</u>:

> In <u>Bivens</u>, the Supreme Court established a right of individuals to sue individual federal agents for damages for unconstitutional conduct in violation of the Fourth Amendment. <u>Bivens</u>, 403 U.S. at 389. The Court later extended this holding to

---

[6] In the context of the crime of assaulting a federal officer, tribal police acting under a 638 contract are considered "federal officers." <u>See</u> <u>United States v. Schiradelly</u>, 617 F.3d 979, 981 n.1 (8th Cir. 2010) (finding that tribal officers employed through a contract with the BIA constituted federal officers for purposes of assault on a federal officer charge under 18 U.S.C. § 111).

[7] To state a claim in federal courts, a plaintiff has to claim, rather than "show," the elements of a cause of action under the pleading standard set by <u>Twombly</u> and <u>Iqbal</u>.

> encompass violations of the Fifth Amendment, <u>Davis v. Passman</u>, 442 U.S. 228, 248–49 (1979), and the Eighth Amendment, <u>Carlson</u>, 446 U.S. at 32–33.

<u>Mehrkens v. Blank</u>, 556 F.3d 865, 869 (8th Cir. 2009) (cleaned up).

This is not the first time a plaintiff has invoked <u>Bivens</u> to sue a tribal officer working under a 638 contract. <u>See</u> <u>Boney v. Valline</u>, 597 F. Supp. 2d 1167, 1183–1186 (D. Nev. 2009) (after initially denying motion to dismiss, granting summary judgment refusing to allow <u>Bivens</u> action against a tribal law enforcement officer based on 638 contract where tribal law enforcement officer was enforcing tribal law against a tribe member on tribal territory); <u>Ten Eyck</u>, 463 F. Supp. 3d at 989 (allowing <u>Bivens</u> claim to proceed against tribal officer because tribal officer was assisting state law enforcement off tribal land, and absent the 638 contract tribal police did not otherwise have authority to so assist).

Plaintiff's argument—that even though the Officers were not directly employed by the federal government they can still be held liable under <u>Bivens</u> if they were engaged in a federal action—oversimplifies the relevant inquiry. That argument may work in the §1983 context but does not necessarily apply in the <u>Bivens</u> context. <u>Compare</u> <u>Doe v. N. Homes, Inc.</u>, 11 F.4th 633, 637 (8th Cir. 2021) (quoting <u>Manhattan Cmty. Access Corp. v. Halleck</u>, 139 S. Ct. 1921, 1928 (2019)) ("Only a state actor can face § 1983 liability. But in a few limited circumstances, a private entity can qualify as a state actor, including when the private entity performs a traditional, exclusive public function, and when the government acts jointly with the private entity.") (cleaned up and citations omitted), <u>with</u> <u>Minneci v. Pollard</u>, 565 U.S. 118, 126 (2012) ("[F]or [<u>Bivens</u>] purposes that fact—of employment status—makes a critical difference."). The Supreme Court has quite recently reemphasized that "recognizing a cause of action under <u>Bivens</u> is a disfavored judicial activity." <u>Egbert</u>, 142 S. Ct. at 1803 (cleaned up and citations omitted). In general, whether a court should recognize a <u>Bivens</u> action is at least a two-step inquiry:

17

> [A <u>Bivens</u>] cause of action may be defeated in a particular case, however, in two
> situations.  The first is when defendants demonstrate special factors counselling
> hesitation in the absence of affirmative action by Congress.  The second is when
> defendants show that Congress has provided an alternative remedy which it
> explicitly declared to be a substitute for recovery directly under the Constitution
> and viewed as equally effective.

<u>Carlson</u>, 446 U.S. at 18–19 (citations omitted and cleaned up).  This inquiry necessarily involves

courts in evaluating "a range of policy considerations . . . at least as broad as the range . . . a

legislature would consider," including "economic and governmental concerns, administrative

costs, and the impact on governmental operations systemwide."  <u>Egbert</u>, 142 S. Ct. at 1802

(cleaned up and citations omitted).  One of the possible considerations in determining if a <u>Bivens</u>

claim should be allowed against a tribal officer due to alleged excessive force against a tribal

member on a reservation is whether the tribal court would adjudicate the merits of such a claim

independently.  <u>See generally</u> <u>Stanko</u>, 916 F.3d at 699 (noting an Indian tribe likely has jurisdiction

to resolve a civil damage action against tribal officers); <u>Corr. Servs. Corp.</u>, 534 U.S. at 72

(discussing how availability of alternative remedies impacts <u>Bivens</u>).  Indeed, the purpose of

<u>Bivens</u> in deterring individual officers from committing constitutional violations might be served

through tribal court actions against tribal officers for on-reservation activity alleged to violate

constitutional rights.  At any rate, faced with this "unenviable task" of weighing policy concerns,

courts are instructed to refrain from recognizing a <u>Bivens</u> cause of action if there is "even a single

sound reason to defer to Congress."  <u>Egbert</u>, 142 S. Ct. at 1803 (cleaned up and citation omitted).

The impact of making the <u>Bivens</u> inquiry in the present case, given the tribal and federal

interests at stake, counsels that this Court proceed with caution.  Here, this Court would likely first

have to decide whether the Officers were acting under color of federal law, tribal law, or both.

Such a determination cannot be made on a motion to dismiss on the current record particularly

when there is authority within the District of South Dakota that a <u>Bivens</u> action might be brought

18

against a tribal officer acting under a 638 contract. See Ten Eyck, 463. Supp. 3d at 988 (recognizing Bivens cause of action brought by non-Indian against tribal police for incident that occurred off tribal land). This Court thus denies the motion to dismiss Count One—without concluding that a viable Bivens claim in fact exists—because Count One states a Bivens claim against the Officers in their individual capacities. See Stanko, 916 F.3d at 699 (despite expanding Bivens being disfavored, the complex inquiry in determining whether Bivens extends to tribal officers renders Bivens action "not a frivolous claim").

However, this fact situation differs from the one in Ten Eyck, where a non-Indian was injured off Reservation land allegedly through the actions of a tribal officer assisting state authorities. Here, Archambault is a tribal member, involved in an incident on tribal land, with tribal police responding, pursuing, and shooting him on the Reservation. In a case that so deeply touches the sovereign interests of the Rosebud Sioux Tribe, the "[p]romotion of tribal self-government and self-determination" presents the question of whether this Court should stay the case to allow the Rosebud Tribal Court to "evaluate the factual and legal bases" underpinning Plaintiff's claims before this Court proceeds to determine whether any Bivens claims can proceed to trial against the Officers. Iowa Mut. Ins. Co. v. LaPlante, 480 U.S. 9, 15–16 (1987).

### 3. Whether this Court should require Plaintiff to exhaust any remedies in Rosebud Sioux Tribal Court.

The Federal Government has a "longstanding policy of encouraging tribal self-government." Iowa Mut. Ins. Co., 480 U.S. at 14; see also Nat'l Farmers Union Ins. Comp. v. Crow Tribe of Indians, 471 U.S. 845, 856 n. 19 (1985) (collecting cases). Because "[t]ribal courts play a vital role in tribal self-government," the Supreme Court has recognized that "[a] federal court's exercise of jurisdiction over matters relating to reservation affairs can . . . impair the authority of tribal courts" and unduly interfere with tribal sovereignty. Iowa Mut. Ins. Co., 480

19

U.S. at 14–18; see also Santa Clara Pueblo, 436 U.S. at 59 ("Even in matters involving commercial and domestic relations, we have recognized that subjecting a dispute arising on the reservation among reservation Indians to a forum other than the one they have established for themselves may undermine the authority of the tribal cour[t] . . . [and hence] . . . i[n]fringe on the right of the [I]ndians to govern themselves.") (cleaned up and citations omitted).  While subject to the plenary authority of Congress, Indian tribes and their courts have retained a great deal of inherent powers in civil and criminal matters arising against their members within the reservation.  See generally United States v. Wheeler, 435 U.S. 313, 326 (1978) ("Moreover, the sovereign power of a tribe to prosecute its members for tribal offenses clearly does not fall within that part of sovereignty which the Indians implicitly lost by virtue of their dependent status."); Plains Com. Bank v. Long Fam. Land & Cattle Co., 554 U.S. 316, 327 (2008) ("As part of their residual sovereignty, tribes retain power to legislate and to tax activities on the reservation, including certain activities by nonmembers, to determine tribal membership, and to regulate domestic relations among members.") (cleaned up and citations omitted); Kelsey v. Pope, 809 F.3d 849, 855 (6th Cir. 2016) (quoting United States v. Lara, 541 U.S. 193, 204 (2004)) ("The sovereign authority of a tribe to punish its own members is 'a power that this Court has called inherent.'").

"Civil jurisdiction over tribal-related activities on reservation land presumptively lies in the tribal courts unless affirmatively limited by a specific treaty provision or by federal statute." Duncan Energy Co. v. Three Affiliated Tribes of Ft. Berthold Rsrv., 27 F.3d 1294, 1299 (8th Cir. 1994).  While not a "jurisdictional prerequisite," exhaustion of tribal court remedies is a matter of comity:

> The deference that federal courts afford tribal courts concerning such activities occurring on reservation land is deeply rooted in Supreme Court precedent. Because a federal court's exercise of jurisdiction over matters relating to reservation affairs can impair the authority of tribal courts, the Supreme Court has concluded

that, as a matter of comity, the examination of tribal sovereignty and jurisdiction should be conducted in the first instance by the tribal court itself.

Id.

The Officers both contend that Plaintiff could have brought a claim in Rosebud Sioux Tribal Court but failed to do so. Doc. 34 at 4; Doc. 26 at 10–13. Plaintiff responds that the "Tribal court cannot assert jurisdiction over Plaintiff's claims" but does not explain why.[8] Doc. 32 at 10. Although 42 U.S.C. § 1983 and Bivens do not vest tribal courts with jurisdiction, a civil action arising out of the exercise of allegedly unreasonable deadly force by a tribal law enforcement officer against a tribal member on the Reservation should be actionable in tribal court. This Court believes the Rosebud Sioux Tribal Court should be first to consider this claim. After all, the Eighth Circuit has said that even when there is "no case pending in tribal court, the reasons for exhaustion cited in National Farmers Union—the policy of supporting tribal self-government, the advantages of allowing a full record to be developed in tribal court, and the benefit of receiving the tribal court's expertise on these issues of tribal sovereignty—" still apply. Stanko, 916 at 700 (quoting Duncan Energy Co., 27 F.3d at 1303 (Loken, J., concurring)). Indeed, in Stanko, the Eighth Circuit—in a case involving a non-Indian plaintiff alleging that tribal officers violated his constitutional rights—affirmed dismissal for the plaintiff's "failure to exhaust an available trial court remedy" to present individual-capacity claims against the involved tribal officers. Id. at 699. If a non-tribal member under Eighth Circuit precedent must exhaust tribal court remedies, then certainly a tribal member should be made to do so.

---

[8] Officer Romero's brief suggests that any tribal court cause of action might be time barred under section 4-2-4 of the Law & Order Code of the Rosebud Sioux Tribe, available at https://narf.org/nill/codes/rosebudcode/title4civilprocedure.pdf. Whether that statute of limitations applies or if there might be tolling of the claim is for the tribal court to decide.

None of the exceptions to the tribal court exhaustion requirement are applicable here. Exhaustion is typically not required "where an assertion of tribal jurisdiction 'is motivated by a desire to harass or is conducted in bad faith,' or where the action is patently violative of express jurisdictional prohibitions, or where exhaustion would be futile because of the lack of an adequate opportunity to challenge the court's jurisdiction." Nat'l Farmers Union Ins. Cos., 471 U.S. at 857 n. 21 (1985) (citations omitted). There is no evidence, nor has Plaintiff alleged or argued, that the Officers' assertion of tribal court jurisdiction is in bad faith or is expressly violative of express jurisdictional prohibitions. In theory, exhaustion could be considered futile if the time for bringing an action in tribal court has passed, but this Court does not know that to be the case. See generally Krempel v. Prairie Island Indian Cmty., 125 F.3d 621 (8th Cir. 1997) (discussing futility exception). Regardless, "principles of comity require that tribal-court remedies *must* be exhausted before a federal district court should consider relief in a civil case regarding tribal-related activities on reservation land." Id. at 622.

Therefore, the Bivens claim in Count One against Defendants Antman and Romero in their individual capacities is stayed so that Plaintiff may sue the Officers in the Rosebud Sioux Tribal Court to seek a remedy there. See generally Fuller v. Ulland, 76 F.3d 957, 960–61 (8th Cir. 1996) ("[W]e stated that 'so long as a possibility of return to federal court remains, a stay rather than a dismissal is the preferred mode of abstention.'"); 186 A.L.R. Fed. 71 (2003) ("A court has the discretion to either dismiss or stay proceedings in such matters pending tribal court exhaustion."); Armstrong v. Mille Lacs Cnty. Sheriffs Dep't, 112 F. Supp. 2d 840, 843 (D. Minn. 2000) ("As a Federal District Court, we have the inherent power to stay the proceedings of an action, so as to control our docket, to conserve judicial resources, and to provide for the just determination of cases which pend before us."). Within twenty-one days of fully exhausting whatever remedies are

available to her in Tribal Court, Plaintiff may file a motion to lift the stay. Perhaps the tribal court case will obviate any <u>Bivens</u> claim or case here.[9]

Counts Two, Three, and Four alleging § 1983 violations are dismissed without prejudice to filing claims in the Rosebud Sioux Tribal Court. <u>Michaelis v. Nebraska State Bar Ass'n</u>, 717 F.2d 437, 438–39 (8th Cir. 1983) ("Ordinarily dismissal of a plaintiff's complaint for failure to comply with Rule 8 should be with leave to amend."); <u>Holmseth v. City of E. Grand Forks</u>, No. CIV. 14-2970 DWF/LIB, 2015 WL 4488424, at *20 (D. Minn. July 23, 2015) ("There is a split in practice among the Federal courts about whether a Rule 12(b)(6) dismissal is normally one with prejudice or without prejudice. While the Eighth Circuit does not appear to have addressed the issue directly, decisions from the Eighth Circuit . . . generally favor dismissals under Rule 12(b)(6) without prejudice, at least where there is no evidence of persistent pleading failures.").

### B. United States' Motion to Dismiss

The United States has moved to dismiss all claims against it. Doc. 22. Although Plaintiff's Complaint names the United States and "Unknown Supervisory Personnel" as defendants, the counts in the Complaint neither mention the United States or its supervisory personnel nor allege any wrongdoing by them. Doc. 1.

Under the traditional doctrine of sovereign immunity, the United States cannot be sued in federal court without its consent. <u>United States v. Mitchell</u>, 463 U.S. 206, 212 (1983) ("It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction."). This has been settled law "since at least the mid-nineteenth century[.]" <u>See</u> Wright & Miller 14 Fed. Prac. & Proc. Juris. § 3654 n.2 (4th ed.)

---

[9] If the case is not resolved through a tribal court proceeding, this Court likely will allow discovery and then reconsider on a motion for summary judgment whether a viable <u>Bivens</u> claim exists.

(collecting cases).  The Eighth Circuit has held that "Bivens and its progeny do not waive sovereign immunity for actions against the United States."  Laswell v. Brown, 683 F.2d 261, 268 (8th Cir. 1982).  Nor can the Plaintiff bring a Bivens-type action against the United States under the doctrine of respondeat superior.  Id.  In other words, "[a] Bivens-type action cannot be prosecuted against the United States government[.]"  Id.; see also Buford v. Runyon, 160 F.3d 1199, 1203 (8th Cir. 1998) ("It is well settled that a Bivens action cannot be prosecuted against the United States and its agencies because of sovereign immunity.").  "Bivens allows for a cause of action for damages against federal officials," but not against the United States. Patel v. U.S. Bureau of Prisons, 515 F.3d 807, 812 (8th Cir. 2008) (citing Corr. Servs. Corp. v. Malesko, 534 U.S. 61, 72 (2001)) ("The prisoner may not bring a Bivens claim against the officer's employer, the United States, or the BOP.").

To bring a Bivens action against federal officials, "the plaintiff must ferret out the officials directly responsible for the alleged constitutional violation." Laswell, 683 F.2d at 268; see also Iqbal, 556 U.S. at 676 ("Because vicarious liability is inapplicable to Bivens and § 1983 suits, a plaintiff must plead that each Government-official defendant, *through the official's own individual actions*, has violated the Constitution." (emphasis added)).  To be sure, "an action may proceed against a party whose name is unknown if the complaint makes allegations specific enough to permit the identity of the party to be ascertained after reasonable discovery." Est. of Rosenberg ex rel. Rosenberg v. Crandell, 56 F.3d 35, 37 (8th Cir. 1995).  But "bare allegation[s] that someone in supervisory authority has been deliberately indifferent, without any specification of that person's contact in fact with the plaintiff, nor even an explicit charge of inadequate training or supervision of subordinates, is [in]sufficient to state a Bivens claim." Id. at 38.

24

Even taking all of Plaintiff's allegations as true, there is nothing to suggest that any government officials other than Officer Romero and Officer Antman were involved in what led to Jacob Archambault's death. Although it is not entirely clear from the briefing, Plaintiff appears to argue that there may be currently unknown federal officials outside of the tribe directly responsible for Archambault's death by way of the 638 contract between the Tribe and the Bureau of Indian Affairs. See Doc. 32 at 7–9. It is unnecessary to decide whether Bivens liability may be imposed on unknown federal supervisors under the 638 contract, however, because Plaintiff fails to allege *any* facts to suggest the level of direct, *purposeful* involvement necessary to hold those in a supervisory role liable for a violation of the Plaintiff's constitutional rights under Bivens. See Iqbal, 556 U.S. at 677 ("In the context of determining whether there is a violation of a clearly established right to overcome qualified immunity, *purpose rather than knowledge is required to impose Bivens liability* on the subordinate for unconstitutional discrimination; the same holds true for an official charged with violations arising from his or her superintendent responsibilities." (emphasis added)). This Court agrees with the United States that Plaintiff's complaint is entirely devoid of any allegations related to "who the Unknown Supervisory Personnel are, what they allegedly did, their position or any other facts that would permit the Unknown Supervisory Personnel to be noticed or identified through discovery." Doc. 33 at 3.

As to Plaintiff's § 1983 claims, the United States is not a proper defendant. McNally v. Pulitzer Pub. Co., 532 F.2d 69, 75 n.7 (8th Cir. 1976) ("42 U.S.C. § 1983 is inapplicable to persons acting under color of federal law."); Accardi v. United States, 435 F.2d 1239, 1241 (3d Cir. 1970) ("The United States and other governmental entities are not 'persons' within the meaning of Section 1983. Therefore, the United States is an improper party in this suit insofar as it is brought pursuant to Section 1983.") (citations omitted).

Beyond the fact that suits against federal officials are not contemplated by § 1983 in the first place, Plaintiff's § 1983 claims against Unknown Supervisory Personnel of the United States fail for similar reasons to those brought under <u>Bivens</u>. "Respondeat superior is not applicable to § 1983 claims." <u>Ouzts v. Cummings</u>, 825 F.2d 1276, 1277 (8th Cir. 1987) (per curiam) (citation omitted); <u>see also Iqbal</u> 556 U.S. at 676 ("[V]icarious liability is inapplicable to . . . § 1983 suits . . . ."). Even if Plaintiff had identified specific supervisory personnel with general responsibility for overseeing the operations of tribal law enforcement, and somehow alleged they were acting under the color of state law, that alone would be insufficient to establish the level of involvement necessary to bring a § 1983 claim directly against said supervisors. <u>See, e.g.</u>, <u>Ouzts</u>, 825 F.2d at 1277 (citing <u>Glick v. Sargent</u>, 696 F.2d 413, 414 (8th Cir.1983)) ("[A] warden's general responsibility for supervising the operations of a prison is insufficient to establish personal involvement."). Simply put, Plaintiff has failed to allege any viable claim against the United States or supervisory personnel of the United States.

**IV. Conclusion and Order**

For the reasons discussed, it is

ORDERED that Joshua Antman's Motion to Dismiss, Doc. 20, is granted in part and denied only to the extent that this Court does not dismiss the <u>Bivens</u> claim in Count One against the Officers in their individual capacities. It is further

ORDERED that United States' Motion to Dismiss, Doc. 22, is granted in full. It is further

ORDERED that Jay Romero's Motion to Dismiss, Doc. 25, is granted in part and denied only to the extent that this Court does not dismiss the <u>Bivens</u> claim in Count One against the Officers in their individual capacities. It is further

ORDERED that this case is stayed to allow Plaintiff to exhaust tribal court remedies, which this Court expects Plaintiff to promptly do. If Plaintiff does not file a tribal court case within 45 days, the Officers may re-file motions to dismiss. Within twenty-one days of fully exhausting her Tribal Court remedies, Plaintiff should file a motion to lift the stay. The parties are to provide jointly-filed updates at six-month increments on the progression of the tribal court case. It is finally

ORDERED that the caption should now delete as defendants the United States and Unknown Supervisory Personnel of the United States but should otherwise be as listed on this Opinion and Order.

DATED this 18th day of November, 2022.

BY THE COURT:

ROBERTO A. LANGE
CHIEF JUDGE